| | |
|---|---|
| STATE OF MAINE<br>CUMBERLAND, SS. | SUPERIOR COURT<br>CIVIL ACTION<br>Docket No. CV-18-87 |
| THOMAS SHORTILL,<br><br>　　　　Plaintiff<br><br>v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>MARK ANTHOINE,<br><br>HEALEY & ASSOCIATES,<br><br>PAUL REVERE LIFE INSURANCE COMPANY,<br><br>and<br><br>UNUM CORPORATION,<br><br>　　　　Defendants | **COMPLAINT** |

For his Complaint, the Plaintiff Thomas Shortill states:

### The Parties

1. The Plaintiff is a resident of Falmouth, County of Cumberland, State of Maine.

2. The Defendant Metropolitan Life Insurance Company (hereinafter "Met Life") is a

1

REC'D CUMB CLERKS
FEB 28 '18 PM 12:10

New York corporation whose principal place of business is in New York, and is successor by merger to New England Mutual Life Insurance Company (hereinafter "NEMLIC").

3. The Defendant Mark Anthoine is a resident of the State of Maine and a licensed insurance agent who in the years 1990 and 1991 acted as an agent for NEMLIC.

4. The Defendant Healey & Associates, Inc. (hereinafter "Healey") is a Maine corporation whose principal place of business is in Maine, and which was Anthoine's employer in the years 1990 and 1991.

5. The Defendant Paul Revere Life Insurance Company (hereinafter "Paul Revere") is a Massachusetts corporation whose principal place of business is in Massachusetts, and it has acted and continues to act as an administrator of the disability income insurance policy issued by NEMLIC to the Plaintiff, which is the subject of this suit.

6. The Defendant Unum Group (hereinafter "Unum") is a Delaware corporation whose principal place of business is in Maine, and which has controlled or acted in concert with its subsidiary, Paul Revere, in administering the Policy which is the subject of this suit.

## The Insurance Application and Its Acceptance

7. On or about November 2, 1990, the Plaintiff met with Defendant Anthoine to discuss his interest in purchasing disability income insurance.

8. In his discussions with Defendant Anthoine, the Plaintiff made it known that he was looking to Anthoine for information, guidance, and advice regarding his desire for optimal income protection if he became disabled.

9. Among other things, the Plaintiff made it known to Anthoine that he wanted income protection if he became disabled due to a disease such as cancer.

10. On November 2, 1990 the Plaintiff, acting in reliance on the advice and guidance of Defendant Anthoine, submitted an application for a NEMLIC disability income insurance policy. A true copy of the application is attached hereto as Exhibit A.

11. Defendant Anthoine completed the application for the Plaintiff's signature and submitted it to NEMLIC on Plaintiff's behalf.

12. Defendant Anthoine assured the Plaintiff that the NEMLIC policy for which he was applying would satisfy the needs and wishes they had discussed, including his desire for income protection if he became disabled due to a disease such as cancer.

13. The application contained a list of "Optional Benefits" which was completed by Mr. Anthoine and which included Form #858, the Lifetime Total Disability Rider.

14. The application stated that the "Optional Benefits" afforded under the Lifetime Total Disability Rider were in the amount of $6,000 per month.

15. The application contained no statement which would have suggested to the Plaintiff, or to any reasonable applicant, that the "Optional Benefits" afforded under the Lifetime Total Disability Rider might be less than $6,000 per month, depending on whether the condition causing his disability was "sickness" or an "injury."

16. The application drew no distinction whatsoever between disability due to "sickness" and disability due to an "injury."

17. The application stated: "Acceptance by the Proposed Insured/Owner of any policy issued on this Application will ratify any changes listed under 'Corrections and

3

Amendment,' except that no changes may be made as to Classification, Age at Issue, Form of Insurance, Amount of Benefits unless agreed to in writing by the Proposed Insured/Owner."

18. No "Corrections" or "Amendments" were listed on the application.

19. NEMLIC accepted the application and issued a Policy with an effective date of November 2, 1990.

20. The Plaintiff never "agreed . . . in writing" that the amount of benefits that would be payable under the Lifetime Total Disability Rider, if he became disabled, would be less than the amount specified in the application he signed – that is, $6,000 per month, without regard to whether the condition causing his disability was "sickness" or an "injury."

21. At some point in or around November 1992, NEMLIC issued and the Plaintiff accepted a Policy Change Rider, reflecting a "Date of Policy Change" of November 2, 1992.

22. The November 1992 Policy Change Rider stated in part:

|  | MAXIMUM MONTHLY AMOUNT | |
|---|---|---|
|  | OLD | NEW |
| Total Disability Benefit for Injury and Sickness: | $6,300.00 | $8,300.00 |
| Lifetime Total Disability Benefit H858 | $6,300.00 | $8,300.00 |

23. The November 1992 Policy Change Rider contained no statement which would have suggested to the Plaintiff, or to any reasonable insured, that the benefits afforded under the Lifetime Total Disability Rider might be different depending on whether the

condition causing his lifetime disability was "sickness" or an "injury." To the contrary, the Policy Change Rider would suggest to a reasonable insured that the lifetime benefit payable under the Policy was the same "for Injury and Sickness."

24. The Plaintiff has no record of when or how he received a copy of the Policy issued by NEMLIC after it approved his application.

25. The Plaintiff has recently received from Defendant Unum, which administers the policy, a copy of his "Application File," which contains a letter from him to NEMLIC dated October 25, 1995, wherein he asked NEMLIC to forward to his office a copy of the policy he had purchased in 1990.

26. Based on the existence of the letter requesting a copy of the policy, the Plaintiff believes, and therefore alleges, that between November 1990 and October 1995 he had never been provided with a copy of the Policy.

27. The "Application File" provided by Unum contains no letter or other document reflecting the transmittal of a copy of the Policy after the Plaintiff's request.

28. Based on the absence of a letter reflecting transmittal of a copy of the Policy, the Plaintiff believes, and therefore alleges, that NEMLIC did not respond to his October 25, 1995 request for a copy of the Policy.

### The Terms of the Policy

29. The Policy issued by NEMLIC provides that the contract between NEMLIC and the Plainitff includes the application and the "Policy Schedule," as well as various riders, amendments, and endorsements.

30. The "Policy Schedule" provides:

   a. That the benefit payable for total disability to age 65 for injury or sickness would be $6,000 per month;

   b. That the benefit payable for total disability after age 65 under the "lifetime total disability" coverage – without distinguishing between disability caused by injury and disability caused by sickness – would be $6,000 per month; and

   c. That the Plaintiff had the right to purchase up to five "units" of additional coverage, each in the amount of $1,000 per month, until November 2, 1998.

31. The "Policy Schedule" also contains the statement: THE MAXIMUM BENEFIT PERIOD MAY CHANGE DUE TO YOUR AGE AT TOTAL DISABILITY. PLEASE SEE POLICY SCHEDULE II."

32. "Policy Schedule II," which is referred to in the "Policy Schedule," reads as follows:

   --------------- MAXIMUM BENEFIT PERIODS -----------------

   FOR INJURY AND SICKNESS:

   | | | |
   |---|---|---|
   | TOTAL DISABILITY | STARTING BEFORE AGE 65 | LIFETIME |
   | TOTAL DISABILITY | STARTING AT AGE 65 BUT BEFORE AGE 75 | 24 MONTHS |
   | TOTAL DISABILITY | STARTING AT OR AFTER AGE 75 | 12 MONTHS |

33. A third policy schedule, captioned "Policy Schedule III," provides that so long as the Plaintiff timely paid his premiums, $300 would automatically be added to his total disability benefit on each of the first five anniversary dates of the Policy, for a total benefit increase of $1,500.

34. In contrast to the terms of the application, the "Policy Schedule," and "Policy Schedule II," the text of the Lifetime Total Disability Benefit Rider purports to create

6

Case 2:19-cv-00190-DBH   Document 1-1   Filed 04/30/19   Page 7 of 19   PageID #: 18
EXHIBIT 1

a distinction between the benefits payable for an insured's lifetime depending on whether the disability is "due to an injury" or whether it is "due to Sickness."

35. The text of the Lifetime Total Disability Rider provides in part:

> For Total Disability Due to Sickness, the monthly amount We will pay will be based on the amount shown on the Policy Schedule. Any Cost of Living benefit rider added to Your Policy shall apply to this amount. The amount shown on the Policy Schedule plus any Cost of Living increase that applies to this rider shall be multiplied by a factor. The factor to be used will be based on Your age at the start of Total Disability which continues until age 65.

The Rider then proceeds to specify "Factors by age for Total Disability due to Sickness."

36. The Policy does not clearly explain what effect the multiplication of the "factor" by the "amount shown on the Policy Schedule" will have on the benefit to which an insured may become entitled.

37. A reasonable insured would not understand that the text of the Lifetime Total Disability Benefit Rider, in contrast to the terms of the application, the "Policy Schedule," and "Policy Schedule II," purports to reduce the benefits payable after age 65 to insureds who become disabled "due to Sickness" between the ages of 55 and 65.

38. The text of the Lifetime Total Disability Benefit Rider further provides: "If a larger amount is payable under this Policy for the same period, the larger benefit will be payable in lieu of this benefit."

39. As a result of the conflict among the application, the "Policy Schedule," the "Policy

7

Schedule II," and the text of the Lifetime Total Disability Benefit Rider, the Policy as a whole is ambiguous, confusing, and misleading.

40. Based on the information provided by Defendant Anthoine and the documents created and provided to him by Defendant Anthoine and NEMLIC, the Plaintiff reasonably believed and expected that his purchase of the Lifetime Total Disability Rider would ensure his eligibility for lifetime benefits in the amount of $6,000, supplemented by any "automatic increases" and by any additional "units" of disability income protection he purchased, regardless of whether his disability was due to "sickness" or "injury"

41. A reasonable person in the Plaintiff's position reading the application and the various policy schedules would have expected and understood that if he became disabled before the age of 65 he could expect to receive a lifetime benefit in the amount of $6,000, supplemented by any "automatic increases" and by any additional "units" of disability income protection he purchased, regardless of whether his disability was due to "sickness" or "injury."

42. When the Plaintiff purchased the Policy from NEMLIC he reasonably relied on the words used in the application, in the "Policy Schedule," and in "Policy Schedule II," and on the advice and guidance he received from Defendant Anthoine, for the belief that if he became totally disabled he would receive a lifetime benefit in the amount of $6,000, plus any "automatic" increases and whatever additional "units" of income protection he purchased, regardless of whether the disability was due to "sickness" or "injury."

43. Although Defendant Anthoine knew that the Plaintiff was relying on him for advice and guidance, neither Anthoine nor any other representative of NEMLIC ever explained to the Plaintiff the relationship which, according to NEMLIC, existed among the various components of the insurance contract – the application, the schedules, and the text of the Lifetime Disability Rider – or how the Plaintiff's eligibility for benefits would be determined if he became disabled "due to Sickness" between the ages of 55 and 65.

44. From 1990 until 2012 the Plaintiff faithfully paid the premiums he owed on the Policy, in reasonable reliance on his understanding of the coverage he had purchased.

45. If the Plaintiff had understood that there was an ambiguity in the Policy, and that NEMLIC or its successor in interest would take the position that his lifetime disability coverage could be reduced if he became disabled "due to Sickness" between the ages of 55 and 65, he would have made alternative or additional arrangements to ensure his future economic security.

## The Plaintiff's Disability

46. Until 2012 the Plaintiff was extremely physically active, working long hours and running distances as great as seven to ten miles per day.

47. Until 2012 the Plaintiff's blood pressure had been essentially normal, with only occasional, isolated exceptions.

48. On January 9, 2012, after undergoing a colonoscopy, the Plaintiff was found to have a highly elevated blood pressure which was completely inconsistent with his medical history up until that event.

49. The hypertensive episode in January 2012 was followed by a series of high blood pressure readings, which coincided with the sudden onset of the symptoms that included profound, incapacitating fatigue, weakness, and shortness of breath.

50. By March 2012 the Plaintiff's symptoms prevented him from continuing the vigorous exercise to which he had become accustomed.

51. Both the Plaintiff's hypertension and his disabling symptoms came on suddenly, and at essentially the same time.

52. The Plaintiff was subsequently diagnosed with hypertrophic cardiomyopathy, which is a thickening of the wall of the heart muscle; and ventricular ectopy, which is an irregular heartbeat.

53. The physiological injury to the Plaintiff's heart occurred suddenly and unexpectedly, and it became manifest suddenly and unexpectedly.

54. By early June of 2012 the Plaintiff was no longer able to work as hard or as long as he had throughout his career.

55. Although the Plaintiff tried to keep working despite his cardiac injury, he was ultimately unable to do so, and he stopped working completely as of June 29, 2012.

56. As a result of his sudden physiologic injury and the sudden onset of symptoms, the Plaintiff became totally disabled from work in his regular occupation as a litigation attorney.

57. Since June of 2012 the Plaintiff has remained totally disabled from work in his regular occupation as a litigation attorney.

58. As a result of his severely compromised health and his inability to work, the Plaintiff

became and remains profoundly depressed.

59. Although the thickening of the wall of the Plaintiff's heart muscle eventually resolved with treatment, he has remained totally disabled due to a combination of cardiac injury and depression.

60. From the time the Plaintiff became entitled to benefits under the policy in 2012 until March 28, 2016, Met Life, which had assumed the liabilities of NEMLIC under the Policy, paid him a total disability benefit of $9,200 per month.

61. By letter dated February 29, 2016, Met Life, acting in concert with Paul Revere and Unum, informed the Plaintiff that as of March 28, 2016, when the total disability benefit payable under the basic coverage expired, the amount of his disability benefit would be reduced by 70%, to $2,760 per month, pursuant to the provision in the Lifetime Total Disability Benefit Rider which purports to reduce the benefits payable to an insured who has become totally disabled "due to Sickness" between the ages of 55 and 65.

62. The Plaintiff has objected to the reduction in benefits and has demanded that Met Life continue to pay the benefit of $9,200 per month, but Met Life has refused.

63. By letter dated June 25, 2016, Met Life, acting in concert with Unum and Paul Revere, reiterated: "We are providing Total Disability benefits under the Sickness provision of the policy."

## COUNT I
## BREACH OF CONTRACT

64. The Plaintiff repeats and realleges the facts set forth in Paragraphs 1 through 63, above, as though set forth in full herein.

65. NEMLIC's acceptance of the Plaintiff's application for insurance resulted in the formation of a contract of insurance on the terms set forth in the application – terms which included coverage under the Lifetime Total Disability Rider in the amount of $6,000 per month (subject to "automatic" increases and the purchase of additional "units" of coverage), with no distinction between disability "due to sickness" and disability "due to an injury."

66. The contractual obligations NEMLIC incurred under the Policy have since been assumed by Defendant Met Life.

67. NEMLIC's later issuance of a Policy which purports to distinguish between disability "due to sickness" and disability "due to an injury" was ineffective to change the terms of the contract created by NEMLIC's acceptance of the Plaintiff's application, which contained no such distinction.

68. Because the Plaintiff accepted the Policy issued on his application and did not agree in writing to any change in the benefit amount specified therein, the text of the later-issued Lifetime Total Disability Rider is not effective to reduce his benefit by 70% on the ground that his disability is "due to Sickness."

69. The position taken by the Defendants – that the Plaintiff's lifetime total disability benefits should be reduced by 70% because his disability is "due to Sickness" – is

inconsistent with and contrary to the Plaintiff's reasonable expectation that he would enjoy the full measure of disability income protection promised in the application and the Policy schedules.

70. The language of the insurance contract as a whole, including the Lifetime Total Disability Benefit Rider, is ambiguous, in that it does not distinguish between accidental injuries and injuries caused by accidental means.

71. Because the insurance contract defines "injury" as "accidental bodily injury," but does not specify that the means or mechanism of the bodily harm must be "accidental," a reasonable person reading the Lifetime Total Disability Benefit Rider would interpret it to mean that his disability is "due to Injury" even if organic disease contributes to the disability, so long as it occurs suddenly and unexpectedly.

72. The ambiguity in the contract as a whole is heightened by the presence of Part 6.2, entitled "CONCURRENT DISABILITY," which recognizes that an insured's disability may be caused by a combination of injury and sickness, and by the absence of any provision in the Lifetime Disability Rider to explain how benefits should be calculated when an insured's disability is caused by a combination of injury and sickness.

73. The ambiguity in the contract as a whole is heightened by the fact that the Lifetime Disability Rider does not define the term "factor," and it does not clearly explain what effect the multiplication of the "factor" by the "amount shown on the Policy Schedule" will have on the benefit to which an insured may become entitled.

74. The provision in the Lifetime Disability Rider, that "If a larger amount is payable

under this Policy for the same period, the larger benefit will be payable in lieu of this benefit," is ambiguous, in that it does not clearly specify whether the Plaintiff should look to his application or to the policy schedules to determine whether "a larger amount is payable under [the] Policy."

75. If the text of the Lifetime Disability Rider is construed so that it purports to reduce the benefits payable to the Plaintiff by 70% – as Defendants Met Life, Paul Revere, and Unum now contend – the Plaintiff nonetheless is entitled to the "larger amount" provided by the application, the "Policy Schedule," and "Policy Schedule II."

76. The Plaintiff's disability is "due to Injury," or to a combination of injury and sickness, as defined in the Policy.

77. Under the Policy as a whole, including the application and the schedules, the Plaintiff is entitled to a continuing benefit in the amount of $9,200 per month.

78. Because Met Life has repudiated the contract, the Plaintiff is entitled to recover a lump sum representing the present value of the Policy's expected payout over the course of his lifetime.

WHEREFORE, the Plaintiff demands a judgment against Met Life declaring that he is entitled to a continuing total disability income benefit in the amount of $9,200 per month; an award of compensatory damages representing the present value of the Policy's expected payout over the course of his lifetime; his costs of suit; and such further relief as the Court deems just in the circumstances.

## COUNT II
## MISREPRESENTATION

79. The Plaintiff repeats and realleges the facts set forth in Paragraphs 1 through 78, above, as though set forth in full herein.

80. Before it entered into an insuring agreement with the Plaintiff, NEMLIC had for many years issued accidental life and disability insurance policies which contained language that clearly and unambiguously afforded coverage only for death or disability resulting from "bodily injury effected solely through external, violent and accidental means," or the like.

81. From that experience, NEMLIC knew that its attempt to limit coverage under the Policy it issued to the Plaintiff – by creating different tiers of benefits for insureds who became disabled due to "sickness" and those who became disabled due to "injury," without further elaboration – was ambiguous, confusing, and misleading.

82. The relationship between the Plaintiff and Defendant Anthoine was a special relationship, inasmuch as Defendant Anthoine invited the Plaintiff to rely, and he did rely, on Anthoine's expertise, advice, and guidance with respect to matters of insurance.

83. Defendant Anthoine intentionally, knowingly, recklessly, or negligently supplied incomplete, ambiguous, confusing, and misleading information to the Plaintiff in connection with the marketing and sale of the Policy, which caused him to reasonably believe that he would be entitled to the full benefit stipulated in the application and the Policy schedules regardless of the cause of his disability.

15

84. In supplying the Plaintiff with incomplete, ambiguous, confusing, and misleading information, Anthoine acted as NEMLIC's agent and within the scope of his employment by Healey.

85. Defendant Anthoine intentionally, knowingly, recklessly, or negligently concealed information material to the Plaintiff's decision to purchase the Policy – specifically, the fact that if the Plaintiff became disabled between the ages of 55 and 65, the amount of the benefit to which he would be paid might depend on whether the disability was "due to Sickness" or "due to an Injury."

86. In concealing material information about the terms of the policy that would be issued if the Plaintiff's application was accepted, Anthoine acted as NEMLIC's agent and within the scope of his employment by Healey.

87. The Plaintiff reasonably relied on the incomplete, ambiguous, confusing, and misleading representations made by Defendant Anthoine concerning the benefit NEMLIC would pay if he became disabled due to "Sickness" between the ages of 55 and 65.

88. The Plaintiff has sustained damage due to his foreseeable and reasonable reliance on the incomplete, ambiguous, confusing, and misleading representations of Defendant Anthoine, which were made while he was acting as NEMLIC's agent and within the scope of his employment by Healey.

89. Defendant Met Life is legally responsible for the intentional, knowing, reckless, or negligent misrepresentations of Anthoine, which were made while he was acting as NEMLIC's agent.

90. Defendant Healey is vicariously liable for the ambiguous, confusing, and misleading representations of Defendant Anthoine, which were made while he was acting within the scope of his employment by Healey

WHEREFORE, the Plaintiff demands judgment against Defendants Met Life, Anthoine, and Healy, jointly and severally, for compensatory damages in an amount that is reasonable in the premises; punitive damages; such other relief as the court determines to be necessary and proper; and his costs of court.

## COUNT III
## UNFAIR TRADE PRACTICE

91. The Plaintiff repeats and realleges the facts set forth in Paragraphs 1 through 88, above, as though set forth in full herein.

92. The Plaintiff purchased disability insurance primarily for personal purposes.

93. NEMLIC, whose fault is attributable to Met Life, and Anthoine, for whose fault Met Life and Healey are legally responsible, used unfair and deceptive trade practices by marketing and issuing, with insufficient and incomplete explanation, a Policy containing provisions which are inconsistent, ambiguous, confusing, and misleading.

94. Ever since it assumed NEMLIC's obligations under the Policy, Met Life has known that the language of the Lifetime Total Disability Benefit Rider was ambiguous, as it had for many years issued policies which contained very clear language affording coverage only where disability resulted from "bodily injuries . . . caused directly and independently of all other causes by violent and accidental means," or the like.

95. In 2016, when they participated in the decision to reduce the Plaintiff's disability

17

benefits, Paul Revere and Unum likewise understood that the language of the Lifetime Total Disability Benefit Rider was ambiguous, as they had in the past issued or administered policies which contained very clear language affording coverage only where disability resulted from "bodily injuries . . . caused directly and independently of all other causes by violent and accidental means," or the like.

96. Met Life, Paul Revere, and Unum have used unfair and deceptive trade practices by reducing the Plaintiff's disability benefits in reliance on the Lifetime Total Disability Benefit Rider, despite their knowledge that the terms upon which they rely are ambiguous, inconsistent with the application and policy schedules, and contrary to the reasonable expectations of the insured.

97. The Plaintiff has suffered loss of money as a result of the use of unfair and deceptive trade practices by NEMLIC, Met Life, Paul Revere, and Unum.

WHEREFORE, the Plaintiff demands judgment pursuant to 5 M.R.S.A. §213 against Defendants Met Life, Anthoine, Healey, Paul Revere, and Unum, jointly and severally, in an amount sufficient to compensate him for his actual damages; such other equitable relief as the court determines to be necessary and proper; and his reasonable attorney's fees and costs.

### COUNT IV
### UNFAIR CLAIMS SETTLEMENT PRACTICE

98. The Plaintiff repeats and realleges the facts set forth in Paragraphs 1 through 95, above, as though set forth in full herein.

99. Despite their knowledge that the Lifetime Disability Benefit Rider is ambiguous, and

that it is inconsistent with the application and policy schedules, Met Life, Paul Revere, and Unum have failed, without just cause, to effect the prompt, fair, and equitable settlement of the Plaintiff's claim, in which liability is reasonable clear.

100. The conduct of Met Life, Paul Revere, and Unum in reducing the Plaintiff's benefits, without regard for the fact that the Plaintiff purchased the Policy in reasonable reliance on representations that he would enjoy a lifetime total disability benefit in the full amount specified in his application and in the policy schedules, is so outrageous that malice may be implied.

WHEREFORE, the Plaintiff demands judgment pursuant to 24-A M.R.S.A. §2436-A, against Defendants Met Life, Paul Revere, and Unum, jointly and severally, in an amount sufficient to compensate him for his actual damages; his costs and disbursements; punitive damages; reasonable attorney's fees; and interest on damages at the rate of 1½% per month.

Dated at Portland, Maine, this 26th day of February, 2018.

_____
Christopher C. Taintor ~ Bar No. 3313
Attorney for the Plaintiff

Norman Hanson & DeTroy, LLC
Two Canal Plaza
P.O. Box 4600
Portland, ME 04112-4600